And now, at this term, the following opinions were delivered, viz.:—
Sewall, J.
The plaintiff demands 1491 dollars, 16 cents, and 5000 dollars, which several sums he alleges to have been received to his use, by the corporation denominated The President, [ * 376 ] Directors, and Company of the Portland * Dank. And in two other counts he sets forth, more specially, an interest of seventy shares in the stock of the same bank, consisting at first of one thousand shares, and in the privilege granted them by their incorporation, to increase their capital stock to the extent of three thousand shares; and he avers that the said corporation, availing themselves of this privilege, did vote and agree upon an increase of .their stock to the extent of two thousand shares, additional to their first subscription, and that he tendered seasonably a subscription of his due proportion in the said additional stock, and the sums of money payable thereon, and demanded his right to subscribe and pay accordingly, and the regular evidence of his additional shares, being one hundred and forty, accruing to him thereon, in the capital stock of the said bank; and that the said corporation have, since that time, by the use and employment of said new capital bank stock, made and received great gain, &c. And further he avers by one of these counts, that his proportion of the said gain is 1464 dollars, 40 cents, which they refuse to pay him; and by the other, that the gain has been at the rate of 10 dollars, 46 cents, upon each of the shares to which he was entitled; but that he was not permitted to subscribe his 140 shares in the said new capital stock, or any of them, and that the due certificates thereof have been refused to him, and the said gains and profits thereon have not been paid to him.
A verdict for the plaintiff has been taken in this action, subject, by the agreement of the parties, to the opinion of the Court upon the evidence in the case, whether the plaintiff is entitled to *331 recover; and if he is, whether his damages shall be estimated at the value of the dividends made upon one hundred and forty shares of the new stock, or at the advance upon those shares above the par value thereof.
By the “act to incorporate sundry persons by the name of the President, Directors and Company of the Portland Bank,” Joseph M’Lellan and others, their associates, successors and assigns, are made a corporation, with the usual powers; and it is further enacted, that the capital stock of the corporation shall consist of a sum not less than 100,000 dollars, nor more than 300,000 dollars, to be divided in shares of one hundred dollars each.
* It is proved that, previous to the act of incorporation, [ * 377 ] the plaintiff had been received as an associate, in which he was allowed seventy shares; and it was admitted, on the part of the defendants, that he subsequently became a member of this corporation, and entitled to that proportion of their capital stock. And it appears that, pursuant to the first requisition of 100,000 dollars, he paid in 7000 dollars, his proportion thereof, and received certificates accordingly; and that while the business of the company proceeded upon that capital, his proportion of the dividends accruing thereon was duly paid to his agent.
In January, 1802, at a legal meeting of the stockholders, it was voted and agreed that the capital stock should be increased. And by a subsequent vote, at the same meeting, the increase is declared to be, of the 2000 shares remaining unsubscribed for. A subscription is directed to be proposed for these shares to the original subscribers, their associates, previous to the act of incorporation, and to the assignees of such original associates, to whom shares had been transferred agreeably to the by-laws of the corporation; and fhe management of this subscription was intrusted with the directors, as \ committee of the stockholders. To this committee the plaintiff tendered his subscription, claiming a right to subscribe for 140 shares of the additional stock. They determined that he was not entitled, and refused to admit his subscription in any part.
The facts, that the instalments for 140 shares in the additional stock were duly tendered in behalf of the plaintiff, at the periods appointed for the payment into the bank, and that his certificates for those shares were demanded at the bank, and refused, are also admitted on the part of the defendants.
Whether the plaintiff has, by these proceedings, sustained any injury, for which he has a right of action against the bank, depends principally upon the inquiry, whether the stockholders, or their president and directors, intrusted with the affairs of the corporation, acting in that capacity, or as a committee of the stockholders *332 specially authorized in the affair of the new or additional slack, had authority to exclude the plaintiff from any share therein
[ * 378 ] * In pursuing this inquiry, I shall endeavor to ascertain the nature and extent of the plaintiff’s interest and property in the Portland Bank, at the time when the vote to increase the capital stock was taken. The limits prescribed by the act of incorporation to the capital stock of this bank were, that it should not be less than 100,000 dollars, nor more than 300,000 dollars The right to create and employ this stock for the purposes of a bank, was vested in the persons named in the act, and in their asso ciates, successors and assigns. Their interest in the 100,000 dollars first paid in, and upon which the corporation commenced business, is.not questioned. The doubt, which has been raised, respects only the power of increasing this stock. This the stockholders, in their vote of January 4, 1802, assumed to be a property not subscribed for, and therefore, one would suppose, not belonging to them; yet they act upon it as subject to their disposal, and determine that some may be permitted to subscribe, while others are to be excluded ; and in a word, that it was new stock, and not an addition of the bank already commenced; and yet it seems to have been understood that the new stockholders would become interested in the original bank-house purchased from the first subscription, and benefited by all the other expenses of the institution, as far as it had proceeded. And thus they undertook to decide that these advantages, procured at the expense of A., were at the disposal of B., or might be taken by him at his will and pleasure, and sold for his benefit, at the market advance on bank stock. The statement of these inconsistencies discovers, I apprehend, very clearly the mistake, in this particular, of the stockholders, who were assembled at that meeting.
Viewing a corporation of this kind as a copartnership, a power of increasing their stock, reserved in their original agreement, is a beneficial interest vested in each partner, to which no stranger can be made a party, but by the consent of each subsisting partner; and it is a power which the subsisting partners must exercise proportion-ably, and according to their interest in the original stock.
Or, considering an incorporation for a bank, as I think it may be more correctly stated, to be a trust created with [ * 379 ] * certain limitations and authorities, in which the corporation is the trustee for the management of the property, and each stockholder a cestui que trust according to his interest and shares, then a limitation of the capital to be employed in the trust, that it shall not be less than one sum, and not exceeding a certain greater sum, is not a power granted to the trustee to create another interest for the benefit of other persons than those concerned in the *333 original trust, or for their benefit in any other proportions than those determined by their subsisting shares. It is clear that a power of that kind might be given, but not by the limitation supposed, which plainly relates to one and the same stock. Whether the least or the greatest, or any intermediate sum be employed in it, the trust is the same, and for the use and benefit of the same persons. A share in the stock or trust, when only the least sum has been paid in, is a share in the power of increasing it, when the trustee determines, or rather when the cestui qui trusts agree, upon employing a greater sum, within the limits provided, in the purposes of the trust.
This view of the subject avoids the objection relied on for the defendants, resting on the circumstance that the shares of this bank are, by the act of incorporation, to be numbered in sums of one hundred dollars each; from which it seems to have been understood that the increase of stock, being to be made by additional shares, required a new subscription. But the legislature could not intend, in providing this mode of enumeration, to change entirely the nature of the trust established by the incorporation; and to abolish the security of the members first engaging in it, in the beneficial interest and property they might acquire in the institution.
Another objection has been stated in the argument for the defendants, which requires some consideration. It is that the act of incorporation provides no means of enforcing payment from the stockholders, whenever an increase of stock should be agreed on.
The act provides that the stockholders shall, at their first meeting, determine the amount of payments to be made on each share, and the time when each payment shall be made. And in a previous clause they have authority to ordain, establish, and put in execution, by-laws, ordinances and regulations * for the [ * 380 j government of the corporation, the prudent management of their affairs, &c. If the power of increasing their stock continued after the dissolution of their first meeting, the power necessarily carried with it the authority of the stockholders to appoint the payments on each share, and to enforce thpm by their by-laws. A vote to increase the capital stock, if it was not the creation of a new and disjointed capital, was in its nature an agreement among the stockholders to enlarge their shares, in amount or in number, to the extent required to effect that increase. The shares first paid in became the first instalment of the increased capital; and the subsequent payments might be reasonably enforced, by providing for a forfeiture of delinquent shares, to be sold and accounted for to the stockholder; the proceeds to be carried to his account, deducting the instalments, or additional payments required. This course has *334 been, I have some reason to believe, -adopted by other similar institutions for a like purpose.
I do not mean to say, however, that a subscription, submitted to the consideration of every stockholder, without any exception, or any attempt at exclusion, might not be equally just, and under some circumstances as expedient as a by-law to forfeit delinquent shares. The operation of such a subscription, if it made any difference, would be a relinquishment of shares by the proprietor; but in that • case the shares relinquished ought to accrue .to the benefit of the institution. If from the progress of the institution, and the expenses incurred in it, any advance upon the additional shared might be obtained in the market, this advance upon the shares relinquished belonged to the whole, and was not to be disposed of, at the will of a majority of the stockholders, to the partial benefit of some, exclusive of others.
The contrary course, taken in this instance, was, in my opinion, an unjust transfer of shares belonging to the plaintiff, to another; or, at least, a refusal to transfer them to the right owner.
It has been made a question, whether the corporation are chargeable with this injustice. Upon this it is sufficient to say that the vote, which has been construed to exclude the plaintiff, [ * 381 ] was established by the stockholders, and * enforced by their committee, specially authorized for the purpose of carrying that vote into effect. So is the evidence. And upon the more general question, whether, upon this evidence, the plaintiff has entitled himself to any remedy, some authorities may be cited, serving as proof of this point, and also indicating the nature of the redress, which the law provides for the injury proved on the part of the plaintiff.
In the case of The Governor and Company of the Bank of England vs. Moffatt, reported in 3 Brown's Chancery Cases, 262, it appears that the executors of the will of James Moffatt, and certain trustees named therein, to whom the residue of his personal estate, consisting of certain bank stock, and other various kinds of public stocks, was specifically devised, had applied to the bank for a permission to transfer in a particular manner, which was refused by the bank; and thereupon the executors commenced an action against the bank in the King’s Bench. This gave occasion to the bill in cnancery by the bank praying an injunction to restrain the defendants from proceeding at law, and insisting upon a certain custom of the bank, opposed to the. claim of the executors. They answered, and admitted the custom and practice of the bank, but insisted upon their right; which being determined in their favor, the chan *335 cellar decreed that the bank ought to permit the transfer as requested, and dissolved the injunction.
In the case of The King vs. The Bank of England, Doug. 584, it was decided that the Court will not grant a mandamus to the bank to transfer stock; because there is a remedy by an action on the case, if they refuse; which, Lord Mansfield said, would lay for a complete satisfaction, equivalent to a specific relief. And in a •note subjoined it appears that a special action of assumpsit was afterwards brought on this case against the Governor and Company of the Bank of England, in which a verdict was found for the plaintiffs, subject to the opinion of the Court, upon the merits of the case.
In the present case, a specific relief, or a restoration of the stock in the Portland, Bank, unjustly withheld or transferred, to the injury of the plaintiff, is not demanded by the action, and it is not, it may be supposed, within the reach of this * Court, [ * 382 ] by any authority they can exercise. The dividends, which have accrued on these shares, would make a part of a specific relief, if that could be granted; but they are not to be estimated in determining upon an equivalent for shares not transferred, and which have become the property of another person, to whom the dividends have been paid, or are due. It is considerable, too, in this view of the subject, that the plaintiff made no payment of stock; and that, after tendering it, he was not obliged, in order to enforce his demand in this action, to deposit his money or hold it unemployed.
Upon the whole, I am of the opinion that the plaintiff’s loss in this case will be compensated, by allowing him the market value óf the shares he was entitled to at the time when he demanded his certificates, and they were refused to him; which, according to the evidence, was on the eleventh of February, 1804; that is, the then current advance upon shares in the Portland Bank. Then it was that the injury by the defendants was complete, and then the plaintiff might have determined the extent of his loss, by a purchase of the number of shares denied him, at the expense of the advance upon them; which being reimbursed in this action, affords him a satisfaction and indemnity equivalent to a specific relief. To the amount, however, of the advance upon 140 shares, must be added the interest of that sum, to the time when judgment shall be entered, in the nature of increased damages.
Sedgwick, J.
[After reciting the history of the cause.] Upon these facts the counsel for the plaintiff contend—
1. That the plaintiff, as a stockholder of the old stock, at the time of the vote to augment the capital of the bank, had a right in the new stock, in proportion to the amount of his interest in the old *336 stock, of which he could not rightfully be deprived by his partners, the other stockholders.
2. That, admitting it was competent to the stockholders, by the manner in which they prescribed the augmentation of their capital, to prevent him from becoming a subscriber to, and interested in, the new stock, they have not done it; but, on the contrary, have expressly, by their vote, authorized him to subscribe to the new, in proportion as he was interested in the old stock.
[ * 383 ] *3. That the plaintiff, having offered to subscribe to the new stock, and to pay, as it became due, the amount of his subscription, and having been prevented from subscribing, and his payments having been refused by the agents and officers of the bank, he has sustained an injury. ,
4. That for this misconduct of its servants, the bank is responsible to the plaintiff.
5. That the plaintiff, having done every thing incumbent on him to become a proprietor in the new stock, is interested in it, and consequently is entitled to his proportion of the dividends upon that stock.
All these propositions are denied by the counsel for the defend ants. To determine on them will decide the merits of the case.
1. Then had the plaintiff, as a stockholder of the old stock, at the time of the vote to augment the capital of the bank, a right in the new stock, in proportion to his interest in the old stock, of which he might not rightfully be deprived by his partners, the other stockholders ? I think that he had.
At the time of the vote to augment the capital of the bank, all the stockholders were partners. The augmentation was supposed to be, and intended for the profit of the joint concern ; the capacity to augment was in virtue of their joint interest; and it could only be done by the will of the majority, and that in pursuance of their original association. The law, by which the partnership existed, and by which the united interest was regulated, was that alone by which the augmentation could be made. Whenever a partnership adopts a project, within the principles of their agreement, for the purpose of profit, it must be for the benefit of all the partners, in proportion to their respective interests in the concern. Natural justice requires that the majority should not have authority to exclude the minority. What is there in this case which should make it an exception from that general principle ? There is nothing, that I can perceive, in the reason and nature of the thing. Suppose it to "have been morally certain, that the augmentation would have been double in value, to the amount of the money necessary to make it1 *337 could a combination of a majority have deprived the minority of their proportion ? The whole number of shares was one * thousand; could the proprietors of five hundred and [ * 384 ] one have engrossed the whole, and deprived their partners of their share ? It is impossible.
At the time of the vote to augment the capital, a banking-house nod been purchased, and become the property of the institution. In this Mr Gray was personally interested, in proportion as his interest in the bank was to the amount of the whole stock. After the capital is increased, the banking-house is, as it was before, the joint property of the stockholders; and the consequence of excluding him from the new stock without any compensation, is depriving him, without any consideration, of two third parts of his property in this house. This shows, in a very glaring light, how unfounded is the principle for which the defendants contend.
2. By the terms of the vote designating those who should be authorized to subscribe to the new stock, the case of Mr. Gray is expressly included. He was an associate with the original subscribers, or an assignee of them, previous to the act of incorporation. This is evident from the application by those concerned to his agents; from his being furnished with the shares in the manner detailed in the evidence; from the notice which was issued to him, to pay his proportion of the capital; and from the certificates of ownership which were afterwards issued to him as a proprietor. So that if it was competent to the stockholders, as they say, to decide who should be interested in the new stock, and be authorized to subscribe to it, the plaintiff had undoubtedly the right which he claimed, and which he says has been violated. How this could have been misunderstood by the committee and officers of the bank, is, from the evidence given at the trial, to my mind, perfectly unaccountable. I do not, however, mean to accede to the practical exposition, which the corporation claimed by their vote, of excluding any of the stockholders from subscribing, if they pleased, to the new stock; but, from what has been said, I think it evident that, from any view that can be taken of the subject, Mr. Gray had a right to subscribe to the new stock. From hence it follows —
3. That the plaintiff, having offered to subscribe to the new stock, and to pay, as it became due, the amount of his subscription ; *and having been prevented from subscribing, and [ * 385 ] his payments having been refused by the agents and officers of the bank, he has thereby sustained an injury.
4. The plaintiff says that the bank is responsible to him for that misconduct of its agents and officers, of which he complains; and I think the position a correct one. That principals and masters *338 should be responsible, civiliter, for the misconduct, negligence, and defaults of their agents and servants, while acting under the authority delegated to them, is indispensable to the security of the rights and property of all, who may be affected by such misconduct, negligence or default. This principle, the justness of which all must readily perceive, has been so frequently recognized in courts of justice, that a reference to authorities is deemed superfluous. I will, however, repeat what is said by Mr. Christian, in his notes on Blackstone’s commentaries, as the reason on which this principle of law rests. “ The law,” he says (5), “ which obliges masters to answer for the negligence and misconduct of their servants, though oftentimes severe upon an innocent person, is founded upon principles of public policy, in order to induce masters to be careful in the choice of their servants, upon which both their own security and that of others so greatly depends.” In no case is this principle of so much importance as in the relation of corporations to their servants ; because, in innumerable instances, they cannot act but by their agents, and there would be no security for those who might be affected by the acts of the agents, if they should abscond or be insolvent. This shows how improper it would be, as contended for by the counsel for the defendants, to oblige one, injured in this way, to resort for his remedy to the agent.
5. The last proposition of the plaintiff is, that he, having done every thing incumbent on him, to become a proprietor in the new stock, is, in fact, interested in it, and consequently that he is entitled to his proportion of the dividends upon that stock.
It cannot but be admitted that Mr. Gray, by offering to the com mittee, appointed by the stockholders, to subscribe for [ * 386 ] his * proportion of the new stock ; by his demanding of the proper officers certificates of ownership of that stock ; an 1 by tendering, at the proper place, the amount to be paid for the stock which he claimed, has become as much entitled to claim to be a proprietor, as he would have been, if he had actually subscribed and paid his money; and the certificates, which ought to have been given to him, had been given to other persons. In this case, he has a right to a complete indemnification; and in that, he would have no more. One question involved in the argument, and referred to our decision, is, whether the plaintiff is entitled to recover the dividends of the new stock. If so, it must be because he is owner of the stock, which I think he is not.
I have always understood that the registry of ownership, kept by the officers of the bank, was to them, the only evidence of it (noi *339 can I understand how, in any other way, their business could be conducted) ; and that, to the individual stockholder, his evidence was his certificate. Suppose a valid contract is made for the future sale of lands, and the agreed price is tendered, and the conveyance stipulated is demanded and refused; and an action for the breach of the contract brought; the plaintiff, at law, would recover, not the land, but damages equivalent to the injury sustained. It is true there can be no title to real estate, but by deed, and that this is required by statute; but it seems to me, from the nature of the subject, that a title of ownership of bank stock must exist in writing, and not merely in parole. How otherwise can the officers of the bank know to whom to pay dividends ? And how are transfers of this species of property to be made and secured ? In the case put of a breach of contract in not conveying real property, this Court has no means of effectuating a specific performance of the contract; and there is the same deficiency of power in the present case.
By the act of incorporation, the amount of the capital of the bank cannot exceed 300,000 dollars, and it was agreed in the argument, that there were subscribers, whose names were entered on the books of the bank, who had deposited to that amount; that the subscriptions were full; and that the capital could not be augmented. Had we power, therefore, * to consider Mr. [ * 387 ] Gray as the proprietor of the 140 shares, for which he ought to have been permitted to subscribe, could we even compel the bank to constitute him such, we must exclude other subscribers to the same amount; subscribers, who have for years been, in all respects, treated as stockholders; who may have been directors; who ¡¡ave the regular and accustomed evidences of ownership; and who have received, from time to time, their dividends; or we may exclude shares which have been a hundred times transferred. What endless confusion and disorder, and what incalculable mischiefs, might result from such a procedure! But which shares are to be excluded ? It is said those last subscribed. Does any one know which were last subscribed ? It is said that this may be known by the numbers. But we have no evidence that the series of numbers conforms to the order of time in which the subscriptions were received ; nor do we know that any such evidence can be obtained. But if it could, what is there in justice or the nature of the thing that should subject the last subscribers to exclusion ? There is no evidence that they did not, as honestly as any other, contrac t with the officers of the bank, and become, as fairly, interested in the concern.
Let the supposition be made that the plaintiff could recover dividends on the new stock; it must be because he is, in fact, a pro *340 orietor. Some, who obtained certificates, and paid their money for them, or their assigns, must of course be excluded. What answer could be given to an action brought for dividends by those so excluded? None, I believe, that would avail the bank. But if there could, what endless confusion and difficulty must attend the adjustment of all the controversies which might result from transfers of such stock ? ’ And what confidence could there be in the purchase of bank stock, if certificates, duly obtained, are not to be relied upon as evidence of ownership ?
But it is said by the plaintiff’s counsel, if I understand them, that none could be interested in the new stock, who were not interested in the old ; and in the same proportion, I have no doubt that every proprietor of the old stock had an election, and might, if they pleased, in proportion to their property in the old, become [ * 388 ] interested in the new stock; but * I do not think they could be compelled to subscribe; and I do think that they might relinquish that right; or that it might be forfeited by not being claimed ; and that, in either case, other subscribers might be admitted to supply the deficiency.
1. They could not be compelled. The shares might be the property of infants, or they might be owned by persons in Europe or India. What compulsion could be used in either case ? Could an action, even if all the stockholders were within the reach of the legal process of this Court, be supported ? I have never heard of any such action, and I presume none could be supported. This indeed is not pretended; but it is said, that the old stock could be sold, if the proprietor neglected to subscribe to the new. Admitting that this was so, it might not afford a remedy; for, by a sale of the old stock, the capital required for the new might not be procured. For every hundred dollars of the old, two hundred dollars of the new was to be supplied ; to attain the object in this way, therefore, the sharks of one hundred of the old, with two shares of the new stock, must bring two hundred, which it may be conceived it would not do. But if this is not such an hypothesis as to afford foundation for an argument, yet a purchaser of the stock would be no more bound to subscribe than the original holder was; and if unwilling or unable to make the requisite advances, the bank would be in precisely the same situation after as before a sale. A sale, therefore, might not be effectual; and if it would, the great purposes of augmenting the capital of the bank might be defeated by the delay. Besides, how could such a sale be reconciled to justice in the cases of infants, feme coverts,' and foreigners ?
2. It will not, I presume, be denied that the right oi the original stockholders to subscribe to the new stock might be voluntarily *341 relinquished. The maxim that volenti non jit injuria, will, with as much reason, apply in this as in any instance that could be mentioned.
3. The rights of the original stockholders might be forfeited by not being claimed within a reasonable time. Taking into consideration the nature of the corporation, and the purposes for which an augmentation of the capital was designed, I am of opinion that the stockholders, when they determined to * augment their capital, ought to have given a reasonable [ * 389 ] time to all their partners to have claimed and exercised this right of subscribing to the new stock; that all who were partners must be presumed, by themselves or their lawful agents, to have notice of all the legal acts and votes of the corporation; and that, if any, in this case, neglected to subscribe, after a reasonable time, strangers or other stockholders might lawfully be admitted to the shares so relinquished. Any other construction would, it seems to me, be followed by consequences so embarrassing as might wholly defeat the purposes intended by the vote to augment the capital of the bank.
The opinion that the right to subscribe to the new stock could not be relinquished voluntarily, or lost by not being claimed, leads to these consequences: that the shares of infants, foreigners, and those who were unable to advance money for the new stock must be sold; and that none could become proprietors of the new, but those who were proprietors of the old stock ; and to me it seems that from thence it would follow that all other subscriptions were void; and that no title was thereby derived to them or their assigns.
If, then, shares might be relinquished by the stockholders, or forfeited by not being claimed within a reasonable time, those who contracted for them, with those who were duly authorized to make such contracts, and who have advanced their money according to the terms prescribed, have acquired a vested interest, which cannot be defeated, because the plaintiff had sustained the injury of which he complains. - In any view of the subject, I cannot think that the plaintiff is entitled to any part of the dividends which have been made upon the new stock.
I have been able to find very little in the books which bears directly on the subject. I have, however, found two cases which are in point. In the case of S. S. Company vs. Curson (6), the cashier of the S. S. Company received money for a subsc: "it Jion, but did not enter the respondent’s name in the book. The respondent recovered the money against the company. Two things, very *342 material in the determination of the case under con- [ * 390 ] sideration, are proved by this case. 1. That * the company is responsible for the acts of their officers. 2. That the receipt of the money did not make the respondent one of the company, but only entitled him to an action for the money paid. And in the case of Stockdale vs. S. S. Company (7), it was determined that the person, whose name is entered in the S. S. Com pony’s books, is with regard to them the proprietor, and they had no right to inquire who the true proprietor is, when the trust does not appear. This resolution seems dictated by sound sense; and I see no other way, as I have already suggested, how the business of such kind of companies could be conducted with regularity or intelligence.
As Mr. Gray is entitled to recover against the bank, it only remains to prescribe to the referees, to be appointed, the measure of his damages. From consideration, I am of opinion that his damages are to be ascertained by the price of the stock, in the market, at the time of the payment of the last instalment, deducting therefrom, the money which was actually to be paid; and I see no reason why-interest from that time should not be added. It is true, that this is contrary to the case of Shepherd vs. Johnson (8), in which it was determined that the price of the stock, on the day of trial, should be the measure of the damages. The decision in. this case is directly opposed to that of Dutch vs. Warren (9), and the case of Saunders vs. Kentish & Al. (10). It is also contrary to the rule long established and invariably adhered to here. It would promote uncertainty, and occasion litigation, to question a rule so long established, upon a subject of such general interest; and for that reason, as well as because I think the rule will most frequently do justice, I am disposed not to disturb it. It is true, no general rule could be adopted, which might not, in particular instances, be injurious. But it is important that a general rule should be established and known ; and as such, I think none so reasonable as that which has been, as far as I know, invariably adhered to here (11); that the price of stock at the time it should be transferred or delivered (and [ * 391 ] the same'rule applies to other personal property), * shall be that by which the damages shall be assessed. If the *343 plaintiff intends to retain the stock, the then price is what he must pay for an equal amount, and if he intends it for sale, that price is what he would obtain for it.
To apply this principle to the case under consideration; when Mr. Gray had tendered the last instalment, he had completed every thing incumbent on him to do. If no injury had been done him, he would have been the proprietor of 140 shares of the stock. The loss to him, therefore, is the difference between the money paid, and what he could have sold that amount of stock for, in the market. As soon, therefore, after the payments on the new stock were completed, according to the vote of the stockholders, as the stock had obtained a market price, that price is to be the basis of the calculation of the referees; and when, upon it, they shall have found a principal sum, to which the plaintiff is entitled, to repair the injury which he has sustained, they will add the interest from that time.
Note. The Chief Justice having been of counsel in this cause while at the bar, and Parker, J., being a stockholder in the Portland Bank, neither of them sat in the cause.
After Sedgwick, J., had delivered the foregoing opinion, he observed that Thatcher, J., after hearing the argument, was of opinion that the plaintiff was entitled to recover, but it was not recollected, that he expressed any opinion as to the measure of the damages; on which subject, Sedgwick, J., wrote to him the first day of the present term, but had not received an answer (12).

 Note 13, on chapter 16, of the first book.

 20 Vin. Abr. 5, pl. 15

 2 Atk. 141, cited 6 Supp. Vin. Abr. 180. Title Stocks, pl. 2.

 2 East. Rep. 211.

 2 Burr. 1010.—1 Str. 406.

 8 Term R. 162.

 [Bush vs. Canfield, 2 Con. Rep. 487.—Wells vs. Abernethy, 5 Connect. 227.—Coldwell vs. Reed, 6 Little, 366.—Ferris vs. Barlow, 2 Aiken, 107.—Whitwell & Al. vs. Kennedy, 4 Pick. 466.—Parks vs. City of Boston, March Term, 1834, MSS.—Pinney vs. Gleason, 5 Wend. 393.—West vs. Wentworth & Al. 3 Cowen, 82.—But when the money is paid in advance, the rule seems to be otherwise.—Gainsford vs. Carroll 3 B. & C. 624.—Shepherd vs. Hampton, 3 Wheat. 204.—M'Donald vs. Hodge, 5 Hay Ten. 85.—Clark vs. Pinney, 7 Cowen, 681.—Ed.]

 [Quaere as to this decision. The Court admit that the plaintiff was not bound to subscribe for or take any of the new shares. If so, was there any such contract between the parties ? Can there be a valid contract, which is binding on one party and not on the other?—Cook vs. Oxley, 3 D. & E. 653.—Routledge vs. Grant, 4 Bigh. 653.—1 M. & P. 717.—3 C. & P. 267.—Head vs. Diggon, 3 M. & S. 97.—M'Tier vs. Frith, 6 Wend. 115.—Gleason vs. Henshaw, 4 Wheat. 228.—Thayer vs. The Middlesex Mutual Fire Insurance Company, 10 Pick. 326.—Humphries vs. Cavalho 16 East. 46.—M'Cullock vs. Eagle Insurance Company, 1 Pick. 278.—Ed.]