(99 App. Div. 377)

STOKES v. CONTINENTAL TRUST CO. OF CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. December 23, 1904.)

1. CORPORATIONS—INCREASE OF CAPITAL STOCK—PURCHASE—RIGHTS OF STOCK-HOLDERS.

Where the officers, directors, and majority of the stockholders of a corporation, acting in good faith for the benefit of the corporation, voted to accept a proposition to double its capital stock, and to sell all the shares of the new stock to the person making the proposition, for 4½ times the par value of the shares, a dissenting stockholder, in the absence of statutory provisions, or conditions in the charter of the corporation, had no vested right to purchase at par a portion of such new stock proportionate to the amount of shares already held by him, and he could not recover damages for the failure of the corporation to so sell to him.

Appeal from Special Term, New York County.

Proceedings by William E. D. Stokes against the Continental Trust Company of the City of New York, in which plaintiff, as a shareholder in the defendant company, claimed damages for its failure to permit him to purchase at par a proportionate amount of stock issued by defendant on an increase of its capital stock. From a judgment for plaintiff, defendant appeals. Reversed.

The plaintiff, upon the organization of the Continental Trust Company, in 1890, became one of its original stockholders; and in the year 1897 he held 221 shares, out of a total issue of 5,000 shares. This trust company started with a capital of $500,000, and it had accumulated on the 1st day of January, 1902, a surplus of $1,048,450.94; making the book value of the stock on that day $309.69 a share. In the summer or fall of 1901 the banking house of Blair & Co. made a proposition to the officers of this trust company to purchase 5,000 shares of its stock at $450 per share, provided the capital stock of the company should be increased by that amount. The proposition of Blair & Co. was coupled with the condition that it should have every share of the new stock. After receiving the proposition of Blair & Co., as appears from the minutes of the executive committee, under date of December 16, 1901, the

president, Mr. Barnard, "reported that an offer had been made by Mr. Dennis, of Blair & Co., for 5,000 shares of Continental Trust Company stock, at $450 a share, provided the existing capital stock was increased to that extent; that the proposed purchasers were a group of men who could bring large deposits and profitable business to the company; and that they would require not more than ten places on the board of trustees, the names to be satisfactory to the executive committee. After careful deliberation, it was resolved that the executive committee recommend to the board of trustees that the proposition be approved, and that the board call a special meeting of stockholders to vote upon the question." This recommendation of the executive committee was approved by the board of trustees, and the latter accordingly, on or about January 6, 1902, through the president of the trust company, sent out a notice calling a meeting of the stockholders for January 29th; the object stated being to vote on a proposition to increase the capital stock, and to determine whether the whole of such increase of stock should be sold to Blair & Co. A circular letter was also sent at the same time, in which the advantages of the proposal made by Blair & Co. were set forth at length, and recommending the acceptance of the proposition. At such meeting the stockholders, without a dissenting vote, adopted a resolution to increase the capital stock; and, on the resolution for the sale of the stock to Blair & Co., this plaintiff, representing 221 shares, and another stockholder, representing 20 shares, were the only dissenting votes. The stock of the company was accordingly increased, and sold to Blair & Co. and their associates at the price named—$450 a share. The rumor of the negotiations with Blair & Co. caused an increase of the value of the stock, so that the market value rose from about $425 per share in the middle of September until in January, 1902, the actual market value of the stock was fixed by stipulation at $550 per share. The result of the sale at the price named ($450) doubled the capital of the company, and more than doubled its surplus, so that the actual book value of every share of stock, including the plaintiff's, was increased from $313 to $381 a share; and the market value of every share of stock, including the plaintiff's, was largely increased, as shown by an actual sale of the stock at $700 a share within but a year after the transaction was consummated. The plaintiff, before, at the time, and after the meeting at which the increase of stock was voted, claimed that he was entitled to a proportionate amount of the new stock at par on the day of its issue; and the learned judge at Special Term decided that the action of the defendant in refusing to receive plaintiff's subscription for 221 shares of new stock at par was unlawful, and a decision was duly made and filed directing judgment to be entered against the defendant for the damages sustained by the plaintiff, namely, the difference between the par value of 221 shares and the market value, with interest and costs. Judgment was accordingly entered for $115,151.07, and from that judgment the defendant appeals.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

William B. Hornblower, for appellant.
Ernest Hall, for respondent.

O'BRIEN, J. The plaintiff's contention is that, when the Continental Trust Company increased its capital stock, he, being a stockholder, had the right, in preference to any other person, to subscribe at par for the new stock in proportion to the number of shares of original stock held by him. This right, he insists, is inherent, presumptive, and vested, and that it is not within the power of all the other stockholders or officers of the corporation to deprive him of it. All the text-writers on corporations range themselves in support of these contentions, and there are many dicta to be found in cases which sustain them. It would unduly extend this opinion to quote from these at length, nor is it necessary, because every text-writer who has dealt with the sub-

ject, as well as all the cases in the different states that have either directly or remotely touched upon it, are cited, collated, and ably discussed in the briefs of counsel. We may, however, profitably refer to Cook on Corporations (5th Ed.) § 286, which embraces, in substance, what is stated by other text-writers; it being said:

"When the capital stock of a corporation is increased by the issue of new stock, each holder of the original stock has a right to offer to subscribe for and to demand from the corporation such proportion of the new stock as the number of shares already owned by him bears to the whole number of shares before the increase. * * * The corporation cannot compel the old stockholders, upon their subscription for new stock, to pay more than the par value thereof."

It is important, in reaching a conclusion, in the absence of any controlling authority in this state upon the precise question involved, that we should have before us the facts which are determinative of the question presented. There is nothing in the charter of the trust company, there is no statutory law, nor any resolution of the directors or the stockholders, requiring that the new issue of stock should be distributed among the existing stockholders. On the contrary, it appears that the officers and trustees recommended the increase, and the stockholders voted for it for the purpose of selling it to Blair & Co. Nor do we understand that it is seriously contended that, in acceding to the proposition of Blair & Co. to sell the entire new issue at the price fixed, there was any discrimination against any stockholder, or that there was any bad faith on the part of the officers, or that all the stockholders did not share equally in the benefits arising from the arrangement which was consummated.

By a process of elimination, therefore, we may pass over such of the cases cited as involve questions relating to the issue of new stock, wherein, whether by force of a statute, or by the charter of the corporation, or the resolution of the directors, express provision is made for distribution among existing stockholders. So, too, we may eliminate the cases wherein the directors of the company were engaged in perpetrating fraud upon stockholders, or where, without authority of law or the vote of stockholders, or other acts clearly ultra vires, the directors attempted to increase the capital stock. In addition, we have cases cited in support of plaintiff's proposition from other states, beginning with the old case (decided in 1807) of Gray v. Portland Bank, 3 Mass. 364, 3 Am. Dec. 156, wherein we find language in the opinion of the court which does support the contentions of the plaintiff as broadly as they are made. From this case, and others following it, the views of the text-writers in their summary of the law on the subject have undoubtedly been taken.

Passing from the decisions of other states, which, however valuable as arguments, are not controlling, we should seek in the decisions of our own state for guidance and help upon a question of so much importance to our own citizens. Strange as it may appear, though the question must have frequently arisen, we are referred to but three cases in which the subject was discussed or passed upon. These are Miller v. Illinois Central R. Co., 24 Barb. 312;

91 N.Y.S.—16

Matter of Wheeler, 2 Abb. Pr. (N. S.) 361; and Currie v. White, 45 N. Y. 822.

The first of these cases (Miller v. Illinois Central R. Co., supra) was decided by the General Term of the Supreme Court in this department in the year 1857. The facts were that R. and G. L. Schuyler held a receipt from the Illinois Central Railroad, which obligated the railroad to issue in payment of a loan 750 shares of the issue of the second million of the company's stock, when authorized by the directors. The Schuylers assigned to the plaintiff, Miller, the right to take and receive to his own use 399 shares of the stock, to be issued as set forth in the receipt. The issue was authorized and made, and the receipt was surrendered by the plaintiff to Schuyler, and he received his 300 shares of the stock. Previously the company resolved to issue 70,722 additional shares, and also determined by the same resolution to whom they should be issued, and what number to each person. If these 70,722 shares had been distributed to the previous holders of stock in proportion to their holdings, the 300 shares subsequently acquired by the plaintiff would have been entitled to 562 shares of the new stock. The plaintiff claimed—and in this he was sustained at Special Term— that he was entitled to this latter amount. The judgment rendered in Miller's favor by the Special Term was reversed by the General Term, and a new trial granted, it being held, first, that if, as between the Schuylers and the plaintiff, the latter had been entitled to the 562 shares of new stock, the company, not having any notice of his rights, was not bound by them; and, second, as between him and the Schuylers, he was not, at the time when this stock was created, and his right to it is said to have accrued, the owner of the 300 shares upon the strength of his title to which he based his claim; and, third, the ownership of these 300 shares did not necessarily nor so far as the evidence shows, entitle the holder to the 562 shares, and the distribution or delivery of them to him, whoever he may have been. The criticism made by the respondent upon this case is that, so far as appears, Miller was claiming the new stock as a gratuity, and without any payment for it whatever. Mr. Justice Peabody, who wrote the opinion in that case, discussed the three points upon which the decision turns, the second of which was that, if the plaintiff was the owner of the 300 shares at the time of the issue of the new stock, he had no absolute right as such owner to a distributive allotment of the new stock.

In the second case (Matter of Wheeler, supra), which did not involve the question here presented, and is valuable only as containing a dictum of a learned judge, it was said:

"As I understand the law, all these important stockholders had a right to share in the issuing of this new stock in proportion to the amount of the stock held by them. And if none of the stock was to be apportioned to the old stockholders, they had certainly the right to have the new stock sold at public sale, and to the highest bidder, that they might share in the gains arising from the sale. In short, the old stockholders, as this was good stock and above par, had a property in the new stock, or a right at least to be secured the profits to be derived from a fair sale of it, if they did not wish

to purchase it themselves; and they have been deprived of this by the course which these directors have taken with this new stock, by transforming or issuing it to themselves and others in a manner not authorized by law."

The third case (Currie v. White, supra) contains an expression by Judge Folger upon the question which he was discussing, and in which a majority of the court agreed, favorable to the plaintiff. He says, referring to the facts of that case:

"The contract between the parties is an agreement for the sale of shares of stock, the shares to be delivered in the future, and the purchase price then to be paid with interest. This contract was executory. * * * But the parties meant more than this by their contract. The one meant to buy and the other agreed to deliver these shares, with all the rights which attached to them at the time of making the contract. One of these rights was to take new shares upon any legitimate increase of the capital stock, which right attaches to the old shares, not as profit or income, but as inherent in the shares in their very creation. Atkins v. Albree, 12 Allen, 359; Brander v. Brander, 4 Ves. (Summer's Ed.) 800, and notes."

So far as the cases in this state are concerned, therefore, they leave the precise question which is presented for our determination an open one; and we are at liberty to consider it as we would any other which has been frequently discussed, but never authoritatively decided. In approaching it, it is important, in speaking of the right which a stockholder has, that we should clearly distinguish between a case where the directors propose to issue new stock and sell it at par; and one wherein it is proposed to sell it at its actual or market value, when it has increased, as in the present instance, to a value more than four times its par value. And another distinction which is important is whether the right which a stockholder has is one which would entitle him to subscribe to the new stock which issued at its actual value, or is a right to subscribe for it at its par value. It is to be noted that the plaintiff here did not offer nor ask to be allowed to subscribe at the price which Blair & Co. were willing to pay to the trust company for the stock when increased. What he insisted upon was that, regardless of its value or the price that the corporation could obtain for it, he had an inherent right to obtain the stock at par. If wrong in this position, even though he might have had a right to his proportion of the new stock, had he offered to pay for it the same price offered to the trust company by Blair & Co., he cannot recover. He stands or falls in the position which he took, and has throughout the controversy maintained—that, notwithstanding the corporation could sell the increased stock to Blair & Co. for $450 a share, he was entitled, upon payment therefor at par, to receive the same number of shares of the increased stock that he held of the original stock of the company.

Much might be said, and considerable force may be derived from the views of text-writers and from the expressions in opinions, in support of the proposition that a stockholder, as against an outsider, has a primary or pre-emptive right to subscribe for any increase of stock made by the corporation. This primary or preemptive right, however, to subscribe at par for increased stock which is to be issued at par, or, where the value of the stock is

greater than its par value, and it is proposed to issue it at its greater price, to subscribe for it at such price, in preference to outsiders, is quite different and distinct from the right here claimed, which is that of a stockholder to have at par stock which is worth or can be sold, in the interest and for the benefit of the corporation, to others, for 4½ times its par value. We do not think, in the absence of any statute of the state conferring such right, or provision in the charter of the corporation, or in the resolution authorizing the increase, or of fraud or illegality in making the increase, that this contention as to the right of a stockholder which the plaintiff here asserts can be sustained either in law or in reason. It is not claimed that there is any statute in this state which confers such right, nor are any of the other conditions to which we have adverted present, which in any way affect the exact question which we are discussing, namely, whether or not the officers, directors, and a majority of the stockholders of a corporation, when acting in good faith, and in the interest and for the benefit of the corporation and the stockholders, could increase its capital stock, and sell it to outsiders for a sum greatly in excess of its par value, without giving to a dissenting minority stockholder the privilege of obtaining his proportion thereof at par. The status as well as the rights of the stockholder with respect to the issue of new or increased stock has been set forth with clearness, and in a manner that commends the reasoning to our judgment, in the opinion of Mr. Justice Peabody in the case, to which we have already adverted, of Miller v. Illinois Central R. R., supra, in the following language:

"The ownership of stock of the company gave to the owner an undivided interest as owner in the property of the corporation—an interest which bore the same proportion to the whole property as his shares did to the whole number of shares. This right was a right or proportionate interest in the assets of the company, and in the proceeds and benefits of the property of the company. These assets were the property of the corporation. This was a right not to any part of the assets separately and exclusively; not a right to an immediate exclusive possession of or property in any particular part of those assets; not a right to an immediate distributive share of the assets or any part of them; and no more a right to a distributive share of any stock of the corporation belonging to itself than to any other property belonging to it. Prima facie all the property of the corporation was dedicated to its use for the purpose of advancing the enterprise for which it was organized; and any stock it might own, whether of its own capital or that of any other company, like any other property, was to be used, in the discretion of its officers, to accomplish that end in the manner most beneficial to the corporation and corporators, as such."

This case, as well as the case cited by the plaintiff, of Reese v. Bank of Montgomery County, 31 Pa. 78, 72 Am. Dec. 726, furnishes reason for the defendant's contention that the right to issue the new stock was like a corporate franchise, or any other property of the corporation which it held in trust for the benefit of all its stockholders, and which was to be administered by the stockholders or the directors for the best interest of all, and in such manner that no one should gain any unfair advantage or benefit therefrom to the exclusion of or at the expense of any of the others.

In nearly all the cases relied upon by the plaintiff, a court of

equity was appealed to, to prevent unjust and unconscionable bene-
fits to officers or fellow stockholders at the expense of another
stockholder. If, however, upon the facts here appearing, the plain-
tiff can succeed, a court of equity will be assisting in consummat-
ing a transaction which will enable a single stockholder to retain
all benefits in common with his fellow stockholders, and, in addi-
tion, obtain the other benefits included in the large money judg-
ment here awarded at their expense. The benefit which has re-
sulted from the sale of the new stock to Blair & Co. has increased
the market value of the plaintiff's shares of stock from $400 to
$700, and has intrinsically increased it in the difference between
the former and the present book value of the stock. These benefits
or advantages were equally shared by every other stockholder.
What, however, the plaintiff, in addition, claims, is the difference
between par and $550, the market value of the stock on the day of
issue to Blair & Co., which advantage will accrue to no other
stockholder but the plaintiff, and which he is to receive at their
expense, because, if the judgment is paid by the company, the loss
will necessarily fall on the stockholders. Such an inequitable re-
sult, which would give the plaintiff an unfair advantage over the
other stockholders, should not be permitted, unless for cogent rea-
sons, or because of some rule of law which makes such a result
inevitable. Recognizing the force of this suggestion, the plaintiff
meets it by saying that this contention of lack of equity or jus-
tice begs the whole question, because, having, as he claims, an
absolute, inherent, vested property right, under the view taken by
text-writers and sustained by expressions in opinions, there can-
not result any inequity from the enforcement of a vested right.
The conclusion would undoubtedly follow if the premises were
true. As we have endeavored to point out, however, the view to
which we incline is that the stock of a corporation is like any of
its other assets; being property which should be held and admin-
istered for the equal benefit of all. The only distinction between
stock and other property of a corporation grows out of the fact
that, in addition to the value attached to stock, there is the ele-
ment and incident belonging thereto of representation and of
voting power, and a voice in the affairs and management of the
corporation. It is because of this feature attaching to stock as
distinguished from other property of the corporation, that cases
without number have held that, with respect to the issue of new
stock, an existing stockholder has a primary, pre-emptive right, as
against an outsider, to subscribe for this stock at the price at
which it is issued by the corporation. Although the reason for
this right is not often expressed, we think that, to a large extent, it
is based upon the view taken by those who have considered the
subject of preserving to each stockholder his proportionate inter-
est in the capital and surplus made by the increase equal to that
held in the former capital of the company. The preservation of
this proportionate interest or representation in the company has
been deemed of such importance that we find in many states stat-
utes passed for the purpose of preserving it, and so, too, in the

charters of many corporations; and in such instances the power of the corporation to issue new stock for more than its par value, or to permit outsiders to subscribe until existing stockholders have refused to take the new stock, is expressly prohibited.

Upon a sale of increased stock, the property of the corporation, there may be, as here, two interests to be considered—one, of the stockholder; and the other, that of the corporation. Both are secured in case the company receives and the stockholder pays as much for the stock as would be paid by an outsider. But if a single minority stockholder, against the view of the majority, can obtain stock at par when the company can obtain a greater sum from an outsider, which the stockholder is unwilling to give, then the company suffers, and a single stockholder, at the expense of the majority, gains. This is tantamount to saying that the right of a single stockholder to obtain increased stock at par is greater than the rights of the officers and other stockholders, and is greater than the rights of the corporation itself. We do not think that the primary right which he may have to subscribe for the new stock can be extended so as to menace the best interests and welfare of the corporation and its stockholders, regarded as a whole. It cannot be that the rights of a single stockholder, when in conflict, are paramount to the rights of the corporation itself.

It is to be noted that the proposition of Blair & Co. was conditioned upon its receiving all of the increased stock. Had the plaintiff offered to pay the same price for his proportion, then a situation would have been presented where the interest and primary right of a stockholder to subscribe would be in direct conflict with what the officers and other stockholders regarded as for the best interests of the company. What our decision would be, were such a question before us, it is unnecessary to say. Not being before us, we do not decide it.

As pointed out, we are not controlled by any statute in this state, nor does the charter of this company forbid it; and we are therefore free to apply the rule well expressed by Chief Justice Sterritt in Morris v. Stevens, 178 Pa. 563, 36 Atl. 151, wherein he says:

"In general, the present holders of stock have a primary right to subscribe, in proportion to their holdings, for any new issue. The stockholders themselves certainly may determine otherwise, and order a sale to the public, and payment of the proceeds into the treasury. But this is exceptional, and the exercise of a reserve power, which should not be permitted unless there is a clear intent of the stockholder to do so."

In the case at bar the intent of the stockholders was made manifest; all, including the plaintiff, who voted, having voted for the increase, and all, excepting the plaintiff and one other small stockholder, having voted to sell the stock at the price offered to Blair & Co. It is contended by the defendant that the plaintiff is estopped from challenging the acts of the other stockholders and officers because he knew that the purpose and object of the increase was to carry out the arrangement which the officers had made to deliver all of the increased stock to Blair & Co. In one aspect,

reading the notice of the meeting, which stated its objects, together with the circular letter explaining the purpose of the officials and directors in recommending the increase, there was, in effect, but a single object, namely, to increase the stock for the purpose of selling it to Blair & Co. In another aspect, it can be viewed as two separate propositions—one, to increase the stock; and the other, to sell to Blair & Co. It is evident from this record that the proposition to increase the capital would never have been recommended by the officers of the company, had it not been coupled with the purpose, expressed to the stockholders, that, when increased, the new stock should be sold to Blair & Co. There is force in the suggestion that the express assent and acquiescence of the plaintiff, with full knowledge of all the facts, in voting for the increase of the stock, estopped him afterwards from questioning the action of the company in completing the transaction by selling it to Blair & Co. If he deemed the purpose sought, of increasing the stock in order to sell to Blair & Co., wrongful, then, seemingly, his duty was, having the time, knowledge, and opportunity, to enjoin the officers from submitting such a proposition to the stockholders and obtaining their votes therefor. Having, however, in common with his fellow stockholders, voted for the increase, and all the other stockholders but himself and another having at the same time voted to empower the officers and directors to complete the transaction, we think that acquiescence in the successive steps leading up to the issuance of the stock does not give the plaintiff the same favorable position which he would have occupied in a court of equity if he had, feeling himself aggrieved, attempted to prevent carrying out the project, or had he consistently stood against the increase the purpose of which he knew. In referring to the plaintiff's attitude in failing to take such action, we have not overlooked what here appears—that, while willing to vote for the increase, the plaintiff, by word and letter to the president of the company and to Blair & Co., frequently and insistently claimed the right to a proportionate amount of the increase of stock when it should be issued.

We refrain, however, from deciding this case upon the question of whether or not the plaintiff is estopped, preferring, as we do, to place our decision upon a broader ground, viz., that, irrespective of our view upon the question not involved—as to whether or not the plaintiff had the primary right, had he offered to pay the same amount as Blair and Co., to subscribe for his proportionate share of the increased stock—we are of opinion that the primary, preemptive, inherent right, or by whatever term designated, which the plaintiff had, did not enable him to subscribe at par for any portion of this stock which the trust company could sell for $450 a share to an outsider, and which sale was made in good faith, with a view of having the proceeds placed in the treasury of the company, and of bringing in "a group of men who could bring large deposits and profitable business to the company," all of which was to redound equally to the benefit and advantage of the corporation and all of its stockholders.

This judgment, we think, should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

VAN BRUNT, P. J., and HATCH, J., concur. PATTERSON, J., concurs in result.

LAUGHLIN, J. (concurring). I concur, in the main, in the views expressed by Mr. Justice O'BRIEN, but wish to add some further observations:

The statute regulating the increase of the capital stock of a corporation (sections 44, 45, and 46 of the stock corporation law [Laws 1892, p. 1836, c. 688]) provides that such increase, within the limitation, if any, prescribed by law, may be made by the unanimous consent of the stockholders, or by the vote of the holders of the majority of the stock, either in person or by proxy, at a meeting duly called for that purpose. The statute is silent as to whom, or the terms upon which, the increase of stock shall be issued. These questions are therefore to be determined by the application of common-law principles. Where the stockholders all agree, of course no question could arise; but where the majority favor the increase of the capital against the wishes of the minority, or upon terms opposed by them, then important questions are liable to arise. In that event, I think the statute confers implied power upon the majority to determine whether the stock shall be issued at par or above par, at what may be deemed its actual value, in view of the value of the assets of the existing corporation, the right to ultimately share in which the holders of the new issue of stock will thus acquire. The action must be taken, however, in a manner that will secure the existing stockholders an opportunity of exercising their pre-emptive right of subscribing for a share of the increased capital stock in proportion to their holdings of the original. I think, for instance, that the sale of the new stock to the highest bidder, upon sealed proposals, would be a violation of this right. A stockholder, prior to the increase, has a right to a voice in the management, and to a share of the assets of the corporation, on final dissolution, in the proportion that his holdings bear to the entire outstanding capital. These rights are materially affected by an increase of the capital stock, and such increase must therefore be made in a manner to enable him to become the purchaser of such a proportion of the increased capital stock as will preserve his right to the same proportion in the assets on final liquidation as he originally had, and also the same voice in the management of the corporation. Moreover, the immediate effect of an increase in the capital stock of a corporation, the value of which is above par, would be to depreciate the value of the original stock, unless the new capital is issued and sold at a valuation equal to that of the original issue. It is therefore manifest that, if the holders of the original stock are not to purchase the entire new issue, it is to their interest that the increase of stock be issued, not at par, but at what will be its actual value, as near as the same may be ascertained. The rule contended for by the plaintiff would be equitable

only in those cases where all existing stockholders could afford to purchase their respective proportions of the new issue at par. This, it is evident, many stockholders could not do. Furthermore, issuing the new stock at its actual value would more substantially increase the working capital, which is ordinarily the principal advantage to be thus attained, whereas, if it is issued at par to the existing holders, they, and not the corporation, will receive on a resale the excess value above par.